Argued and submitted August 13, 2015, affirmed December 14, 2016

Gene MANLEY,
*Plaintiff-Appellant,*

*v.*

CITY OF COBURG,
*Defendant-Respondent.*

Lane County Circuit Court
121225964; A156193

387 P3d 419

William H. Sherlock argued the cause for appellant. With him on the briefs was Hutchinson, Cox, Coons, Orr & Sherlock, P.C.

Milo Mecham argued the cause and filed the brief for respondent.

Before Ortega, Presiding Judge, and Lagesen, Judge, and Garrett, Judge.

## GARRETT, J.

Plaintiff sued defendant, the City of Coburg, for breach of contract, alleging that the city violated the terms of a 1963 water-services agreement. Plaintiff, who lives outside the city limits but receives his water from the city, alleges that the city breached the agreement by charging plaintiff a higher rate than the rate the city charges residents within its limits. Both parties moved for summary judgment. The trial court denied plaintiff's motion and granted the city's motion, concluding that the city's obligations under the 1963 agreement were terminated and that, even assuming that ongoing obligations exist, the agreement does not limit the city's ability to raise plaintiff's water rates. Plaintiff appeals. As explained below, we agree with the trial court that the 1963 agreement does not contain any promise by the city to charge plaintiff the same rates for water as it charges its residents. Accordingly, we affirm the entry of summary judgment for the city.

The facts pertinent to our review are not disputed. Plaintiff lives in a residential subdivision called Pioneer Valley Estates (PVE), comprising several dozen homes located approximately one mile outside the city limits of Coburg. PVE receives its water from the city; that relationship has been the subject of intermittent disputes between the two entities.

PVE was developed by Walter Sears. In 1963, Sears, doing business as PVE, and his wife entered into a single-page agreement with the city regarding the provision of water to PVE. We provide the entire agreement:

"AGREEMENT

"THIS AGREEMENT, made this 15 day of Nov[ember], 1963, by and between WALTER F. SEARS, dba PIONEER VALLEY ESTATES, and MRS. WALTER F. SEARS, first party, and CITY OF COBURG, a municipal corporation, second party;

"WITNESSETH:

"(1) That first party agrees to drill an adequate well and to install the necessary pumps, tanks, motors and pipes necessary for a complete water works system on the

PIONEER VALLEY ESTATES tract at Route 2, Box 427A, Coburg, Oregon; such installation to be in conformance to specifications and requirements to be furnished by second party and to be such as will pass inspection by all necessary government authorities;

"(2)   That upon completion of (1) above, first party will deed and convey said system, including easements and all other equipment and incidentals necessary to operate such system to second party;

"(3)   That for and in consideration of the above, second party agrees to accept said conveyance, to operate said system, and to incorporate said system into the second party's water works system as soon as is reasonable under the prevailing circumstances;

"(4)   That it is understood and agreed that upon completion of (2) above, the continued cost of service, maintenance, replacement, and addition of and to said system, and all operating expense of said system shall be the obligation of second party; however, second party retains the right to assess to individual users of the said waterworks system such charges, costs and assessments as are assessed to users of second party's existing system;

"(5)   That aside from the duties and obligations of the parties set forth herein, neither party shall have any other duties, liabilities and obligations of any kind."

(Capitalization in original.) From 1963 until 1990, the city charged PVE residents approximately the same water rates that city residents paid. In July 1990, the city began charging PVE residents higher rates than those charged to city residents. When plaintiff and other PVE residents complained that doing so breached the 1963 agreement, the city brought a declaratory relief action to establish the parties' rights and obligations.

The city and the PVE residents reached a settlement in 1995. The settlement agreement provided that the city would attempt to annex PVE into the city and extend a water line to PVE; that, in the interim, PVE residents would be charged the same water rates as city residents; that, if annexation was successful, PVE would continue paying the same rates as city residents; and that, if annexation was not successfully accomplished within five years,

the parties would return to the "status quo ante" and the 1995 settlement agreement would be of no further force or effect. The hoped-for annexation did not occur, but the city did construct a water line connecting PVE to the city's water system. That was accomplished by 2004 and the PVE well was decommissioned.

The city charged PVE residents the same water rates as city residents until March 2012, when it raised the PVE rates to the standard rate for customers located outside the city limits. Plaintiff brought this action, alleging that the city breached the 1963 agreement.

Both parties moved for summary judgment. In relevant part, plaintiff argued that the city agreed in 1963 to charge PVE residents the same rates for water as it charged city residents. In support of that contention, plaintiff relied on the language in section 4 of the agreement that states, "[the city] retains the right to assess to individual users of the said waterworks system *such charges, costs and assessments as are assessed to users of [the city's] existing system*[.]" (Emphasis added.) Plaintiff also argued that his interpretation of the agreement was supported by extrinsic evidence, including the parties' course of performance in the years following the entry into the agreement, as well as a statement found in the minutes of a 2012 meeting between PVE residents and city representatives, in which the city's attorney said, "When the City assumed operation and management of the PVE system in 1963, there was an agreement that PVE residents would be charged the same user rates as City residents." The city countered that the disputed provision in section 4 of the agreement was not a promise regarding *rates* but, rather, a reservation of its rights to assess the same types of charges on PVE users as are assessed to other users of its water system. The city also argued that it had fully performed its obligations under the agreement by extending a water transmission line to PVE in 2004 and connecting PVE's system to its own. The trial court denied plaintiff's motion and granted the city's motion. In a letter opinion, the trial court reasoned:

> "[T]he 1963 Agreement does not bind the City in perpetuity. At its core, the 1963 Agreement concerned the

construction and continued operation of the well drilled by the Sears. The City agreed to accept conveyance of the well, operate and maintain it, and incorporate it into its existing system. The City accepted, operated, and maintained the well but did not incorporate it into the City's system due to the absence of a water transmission line. In 2004, the water transmission line between the City's water system and PVE was completed and the well that was the subject of the 1963 Agreement was decommissioned.

"Even if the obligations under the 1963 Agreement somehow continued to bind the parties after the well's decommission, nothing in that agreement requires the City to charge the same rates to PVE residents as it does City residents. Plaintiff rests his claim on an implied term of the 1963 Agreement that such rates be identical. However, there is no ambiguity in the 1963 Agreement. Statements from individuals and course of performance subsequent to entry of that Agreement do not create ambiguity. Parol evidence is admissible to explain an ambiguity, not to create one.

"The 1963 Agreement states: '[The City] retains the right to assess to individual users of the said water-works system such charges, costs and assessments as are assessed to users of [the City's] existing system.' The City merely retained rights in the contract—it did not set forth any promise to charge certain rates in perpetuity."

(Brackets in original.) The trial court entered a general judgment dismissing plaintiff's claims, and plaintiff timely appealed.

To summarize what we understand to be the trial court's reasoning, the court concluded that: (1) the 1963 agreement primarily concerned the "construction and continued operation of the well" and, therefore, the city fulfilled its obligations under that agreement after the well was decommissioned following the extension of a water line to PVE in 2004; and (2) even assuming that the city had any remaining obligations under the 1963 agreement, the terms of that agreement are unambiguous, and do not contain any promise by the city to charge plaintiff the same water rates as it charges residents of the city. On appeal, plaintiff challenges both conclusions.

Oregon courts interpret contractual provisions using the process set out in *Yogman v. Parrott*, 325 Or 358, 361-64, 937 P2d 1019 (1997). We begin by examining the text of the disputed provision in the context of the contract as a whole to determine whether the disputed provision is ambiguous. *Id.* at 361; *see also Eagle Industries, Inc. v. Thompson*, 321 Or 398, 405, 900 P2d 475 (1995) (the court looks at "the four corners" of a written contract and considers the contract as a whole with emphasis on the provision in question). Whether a provision is ambiguous is a question of law. *Williams v. RJ Reynolds Tobacco Company*, 351 Or 368, 379, 271 P3d 103 (2011). In the absence of any ambiguity, our analysis ends and we construe the words of a contract as a matter of law. *Yogman*, 325 Or at 361 (citing *Eagle Industries, Inc.*, 321 Or at 405); *see also* ORS 42.230 (in construing an instrument, "the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such construction is, if possible, to be adopted as will give effect to all").

A contract term is ambiguous if, after considering the contract as a whole, as well as the circumstances under which it was formed, it is susceptible to more than one sensible and reasonable interpretation; it is unambiguous if its meaning is "so clear as to preclude doubt by a reasonable person." *Deerfield Commodities v. Nerco, Inc.*, 72 Or App 305, 317, 696 P2d 1096, *rev den*, 299 Or 314 (1985); *see also Morton & Associates, LLC v. McCain Foods USA, Inc.*, 226 Or App 532, 539, 204 P3d 167, *rev den*, 346 Or 363 (2009) ("[I]n assessing whether an ambiguity exists in the terms of an agreement, a court may consider extrinsic evidence of the parties' intent that is limited to the circumstances under which the agreement is made."); ORS 42.220 ("In construing an instrument, the circumstances under which it was made *** may be shown so that the judge is placed in the position of those whose language the judge is interpreting."). The mere fact that parties to a contract urge competing interpretations of that agreement does not compel a conclusion of ambiguity. *See* Samuel Williston, 11 *Williston on Contracts* § 30:4 (4th ed 2016) ("[A] contract is not ambiguous merely

because a party to it, often with 20/20 hindsight colored by self-interest, disputes an interpretation which is logically compelled.").

In two separate assignments of error, plaintiff challenges the trial court's conclusion that the 1963 agreement does not create any contractual obligations from the city to plaintiff regarding water rates.[1] In the first assignment, plaintiff asserts that the trial court erred in concluding that the city has no outstanding obligations to plaintiff with regard to rates or operation of the city's water system. Plaintiff points to the agreement's language saying that "the *continued cost* of service, maintenance, *replacement*, and addition of and to said system, * * * shall be the obligation of [the city]." (Emphases added.) According to plaintiff, that language evinces the parties' shared understanding that future improvements to the PVE system—including the extension of a water line to PVE—would continue to be the city's obligation, and would not operate to terminate the agreement. Moreover, plaintiff rejects the trial court's determination that the primary objective of the 1963 agreement was merely the construction and operation of a well until such a time when the city was able to incorporate that well into its existing water works system.

In the second assignment of error, plaintiff argues that the trial court erred in concluding that the 1963 agreement is unambiguous. Specifically, plaintiff argues that the agreement is susceptible to more than one plausible interpretation based on the fact that "defendant and plaintiff both offer different but credible interpretations" of the following language in section 4 of the agreement: "[The city] retains the right to assess to individual users of the said waterworks system *such charges, costs and assessments as are assessed to users of [the city's] existing system.*" (Emphasis added.) Plaintiff further contends that the trial court erred by refusing to consider extrinsic evidence that, in plaintiff's view,

_____

[1] Although framed as separate assignments, plaintiff essentially raises a single assignment of error—to the trial court's grant of the city's motion for summary judgment. *See* ORAP 5.45(3) ("Each assignment of error shall identify precisely the legal, procedural, factual, or other *ruling* that is being challenged." (Emphasis added.)); *see also Rutter v. Neuman*, 188 Or App 128, 132, 71 P3d 76 (2003) (assignments of error are to specific rulings rather than legal conclusions).

supports his interpretation that the city agreed to charge PVE users the same rates as city residents. As noted, that evidence included a statement made by the city's attorney in 2012 that, "When the City assumed operation and management of the PVE system in 1963, there was an agreement that PVE residents would be charged the same user rates as City residents," as well as the fact that, between 1963 and 2012, the city charged PVE residents the same rates for water as city residents. Plaintiff contends that, at the very least, that extrinsic evidence creates an ambiguity in the contract language that renders summary judgment inappropriate in this case.

The city responds that the trial court correctly concluded that no remaining contractual obligations exist between plaintiff and the city under the agreement; that the court correctly declined to consider plaintiff's proffered extrinsic evidence because that evidence does not relate to the circumstances under which the agreement was formed; and that the court correctly concluded that the agreement is unambiguous because it contains no express promise regarding rates, but, rather, reserves the city's right to charge plaintiff for use of its water system.[2]

It is unnecessary under the circumstances of this case to address whether, in the abstract, all of the city's obligations under the 1963 agreement were fulfilled when the city connected the PVE system with the city's own. Neither the record nor the parties' arguments are particularly well developed on that question; rather, both parties have focused on their competing interpretations of section 4 of the agreement. For the reasons explained below, we agree with the city and the trial court that the disputed provision, viewed in the context of the agreement as a whole, does not contain a promise that the rates charged to plaintiff would be identical to those charged to residents of the city. Thus, even assuming that the 1963 agreement continues to bind the city in some fashion, plaintiff has not established a breach.

_____

[2] The city also contends that plaintiff failed to preserve for appeal his claim that the agreement is susceptible to more than one reasonable interpretation. Although plaintiff's arguments below were somewhat unclear, we are satisfied that the issue of ambiguity was properly before the trial court. Accordingly, we reject the city's contention without further written discussion.

We begin with the text of the disputed provision. *Yogman*, 325 Or at 361. Again, section 4 of the 1963 agreement provides, in part, that "[the city] retains the right to assess to individual users of the said waterworks system such charges, costs and assessments as are assessed to users of [the city's] existing system[.]" Plaintiff contends that the text can plausibly be read as a promise to charge PVE residents *equivalent* rates as city users. That is, according to plaintiff, the concluding words of the paragraph should be understood to mean that the city retains the right to assess PVE residents "the *same rates* as are assessed to *city residents*." The difficulty with doing so is threefold.

First, plaintiff does not explain how the text, which is phrased in terms of a reservation of rights, can be understood to impose an affirmative obligation. Second, even if one interprets the language as limiting the city in some way, it is not in the sense urged by plaintiff. Although the dictionary defines the word "such" in various ways, as relevant here, "such" means "of a kind or character about to be indicated, suggested, or exemplified" and "of the same class, type, or sort : in the same category." *Webster's Third New Int'l Dictionary* 2283 (unabridged ed 2002). Those definitions suggest that the parties intended the city to be able to charge the same *types* of charges as are assessed to users of the city's existing system. That interpretation is bolstered by the fact that the provision refers not merely to "rates" but, more expansively, to "charges, costs and assessments." Third, plaintiff's interpretation equates the term "users of [the city's] existing system" with "city residents." It is undisputed, however, that the city's waterworks system is used not only by city residents, but also by others who, like plaintiff, live outside the city limits and are charged different rates than city users. Although plaintiff argues for the use of extrinsic evidence in this case (addressed further below), plaintiff has offered *no* evidence that, in 1963, all "users of [the city's] existing system" were charged the same rates as city residents. Thus, plaintiff's interpretation constrains the city's reservation of rights by assuming that "users" means the same thing as "residents," when the former term is in fact broader, and we presume that the parties' choice of that term was intentional.

We also consider the disputed language in context. *See Deerfield Commodities*, 72 Or App at 319 ("In determining the meaning of the contract, we are required to consider the instrument as a whole rather than its isolated clauses."). The provision at issue is found in one of five sections that deal primarily with the construction and transfer of the PVE water system to the city. Section 4 provides that, upon receiving the PVE system at no cost,

> "the continued cost of service, maintenance, replacement, and addition of and to said system, and all operating expense of said system shall be the obligation of [the city]; however, [the city] retains the right to assess to individual users of the said waterworks system such charges, costs and assessments as are assessed to users of [the city's] existing system[.]"

Whereas the beginning of that section enumerates the city's obligations with respect to the operation of the PVE system, the parties' use of the words "however" and "retains the right" suggest to us that what follows is something *other* than a promise. *See generally State v. Boly*, 210 Or App 132, 135-36, 149 P3d 1237 (2006) (in the context of statutory interpretation, exceptions are usually signified by use of "words of limitation" such as "except that," "however," or "provided that").

In short, the most natural reading of the disputed provision is that the city preserved its right to charge users of PVE's system in exchange for the city's promise to service and maintain that system. Moreover, to the extent that there remains an ambiguity as to whether the disputed language is *merely* a reservation of rights, or, instead, constrains the city in some way, that ambiguity does not aid plaintiff. That is so because neither interpretation—that the city made *no* promise regarding the costs of water service or, in the alternative, that the city promised to impose only the same types of costs as it charged other users of its system—raises any material issue of fact. *See* ORCP 47 C (a party is entitled to summary judgment if "the pleadings, depositions, affidavits, declarations and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law"). If the disputed provision is interpreted merely as a reservation of

rights to recoup the city's costs for servicing PVE, then the city's actions in raising plaintiff's rates did not breach the agreement, and plaintiff's action for breach of contract must fail. The same is true even if the city does retain an obligation under the agreement to charge plaintiff commensurately with other users of its system. As noted, other "users" of the city's system include those who, like plaintiff, reside outside the city's limits and pay a separate water rate. By harmonizing plaintiff's rates with the established rate for such users, the city cannot be said to have breached any promise to charge plaintiff "such charges, costs and assessments as are assessed to users of" the city's system.

Plaintiff nevertheless contends that the trial court erred by refusing to consider extrinsic evidence that, according to plaintiff, supports his interpretation of the agreement and creates an ambiguity that makes summary judgment inappropriate in this case. We disagree. As noted, plaintiff's proffered extrinsic evidence consisted of a 2012 statement by the city's attorney that, "When the City assumed operation and management of the PVE system in 1963, there was an agreement that PVE residents would be charged the same user rates as City residents," as well as the fact that between 1963 and 2012, the city mostly charged PVE residents the same rates for water as it did city residents. Although courts may consider extrinsic evidence of the parties' intent in determining whether a contractual provision is ambiguous, such evidence is limited to the circumstances under which the agreement was made. Extrinsic evidence of the parties' conduct during the life of an agreement is available to *resolve* a contract ambiguity, not to *create* one. *Harris v. Warren Family Properties, LLC*, 207 Or App 732, 738-39, 143 P3d 548 (2006) (declining to consider extrinsic evidence of the parties' conduct during the life of the contract to establish an ambiguity). Where, as here, the text of an agreement is capable of only one reasonable interpretation, a trial court does not err in refusing to consider extrinsic evidence of conduct and statements that bears no relationship to the circumstances surrounding contract formation.

Affirmed.